525 A.2d 1

Southeastern Pennsylvania Transportation Authority, Appellant *v.* Transport Workers' Union of America, AFL-CIO, and Transport Workers' Union of Philadelphia Local 234, Appellees.

Argued December 10, 1986, before President Judge CRUMLISH, JR., Judges CRAIG, MACPHAIL, DOYLE, BARRY, COLINS and PALLADINO.

*James A. Matthews, III,* with him, *John Markle, Jr., Drinker, Biddle & Reath,* for appellant.

*Michael Brodie,* with him, *Joseph Michael Venditti, Sacks & Basch,* for appellees.

OPINION BY JUDGE COLINS, April 24, 1987:

Southeastern Pennsylvania Transportation Authority (SEPTA) appeals an order of the Court of Common Pleas of Philadelphia County which upheld the award of an arbitration board (Board) reinstating Earl Melvin (Melvin) as a trolley operator, a position from which he had been disqualified pursuant to medical standards promulgated by SEPTA. At issue is whether SEPTA's promulgation of medical standards for the disqualification of transit vehicle operators is an inherent prerogative of the public employer removed from the scope of collective bargaining in both substance and application.

Mr. Melvin began his employment with SEPTA as a trolley operator in February, 1973, and continued in that position until May, 1981, at which time he was hospitalized with chest pains. Diagnostic procedures revealed that Melvin suffered coronary artery disease and bypass surgery was performed. Upon his recuperation, Melvin attempted to return to his former position but was disqualified from doing so by SEPTA's Medical Examiner, pursuant to SEPTA's medical standards for employment[1] which pertinently provided as follows:

---

[1] The Unions do not contest that Mr. Melvin's physical condition, prior to his surgery, fell within the penumbra of the general medical classification, ischemic heart disease.

The causes for rejection are not confined to those named below. Any disease, injury, abnormality, condition, or combination of conditions, which in the opinion of the Medical Examiner would tend to impair health or prevent proper performance of duties by the applicant, or risk the safety and welfare of equipment and passengers, may be a cause for rejection.

*Ischemic Heart Disease:*

I) Angina Pectoris—II) Myocardial Insufficiency—III) Myocardial Infarction.

*New Applicants:* Presence of either one, rejects. History of either one, rejects.

*Old Employees:*[2]

*Operators: Totally and permanently disqualified. Non-Operators:* If driving any company vehicle, totally and permanently disqualified. If operating machinery and all other non-operators—temporary disability until absolutely controlled or may totally and permanently disqualify.

. . .

*Addendum: The performance of cardiac surgery for correction of any heart condition will not preclude the disqualification of any employee, if applicable, when the underlying condition has already disqualified.* (Emphasis in original in part and added in part.)

Mr. Melvin was permitted to return to work as a cashier, but continued to request transfer to his former position as a trolley operator. Upon SEPTA's continued refusal to grant the transfer, the Transport Workers' Union of America, AFL-CIO, and Transport Workers' Un-

---

[2] The term "old employees" as it appears in SEPTA's medical standards for employment refers to current employees.

ion of Philadelphia, Local 234 (Unions) filed a grievance and the matter proceeded to the Board. SEPTA objected to the jurisdiction of the Board, contending that the disqualification of an employee in accordance with the relevant medical criteria was not an issue governed by the collective bargaining agreement so as to render Mr. Melvin's complaint subject to the arbitration mechanism contained therein.

After hearings, the Board determined that the question of SEPTA's refusal to restore Melvin to his prior position was arbitrable and thereby encompassed· review as to the manner in which SEPTA applied its medical standards, "without . . . making any determination as· to the correctness or propriety of the Policy itself." Noting Sections 304 and 305 of the Agreement, entitled, respectively, "Transfers" and "Qualification for Transfers," the Board found that SEPTA had contractually agreed to submit matters involving employee transfer following medical disqualification to grievance resolution. The Board found that SEPTA's rote application of its medical standards without consideration of Mr. Melvin's individual circumstances and the testimony of his cardiologist who stated that he was asymptomatic and able to resume his former position was arbitrary and capricious. Finding that "no question about grievant Melvin's physical capabilities [exists] at [this] time," the Board ordered Melvin be reinstated as an operator.

Upon appeal, the trial court affirmed Mr. Melvin's reinstatement, found that the contractual provisions, notably Sections 202(b),[3] 304 and 305, indicated an inten-

---

[3] Section 202(b) of the collective bargaining agreement provides as follows:

In the event of a disagreement between the union and [SEPTA] as to the interpretation, application or performance of this agreement, either the union or the authority may cause such dispute to be referred to a board of arbitration as hereinafter provided.

tion of the parties to subject grievances of this nature to arbitration and concurred in the Board's assessment that SEPTA's rote adherence to the medical standards in the face of contrary medical evidence as to Melvin's physical capabilities constituted a breach of the collective bargaining agreement. The instant appeal followed.

Upon appeal, SEPTA contends that: (1) the determination of the medical qualifications of a transit vehicle operator is an inherent managerial prerogative reserved to the public employer by virtue of Sections 702 and 703 of the Public Employe Relations Act (PERA), Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §§1101.702-1101.703, and is not a condition of employment subject to collective bargaining or arbitration under a collective bargaining agreement; and (2) assuming arguendo, that the above provisions of PERA do not preclude the negotiation of medical standards of employment, SEPTA and the Unions herein did not so bargain.

Our limited role with respect to the issue of arbitrability in the instant matter is to determine whether the question of Mr. Melvin's medical disqualification arguably required interpretation of a provision in the collective bargaining agreement. If the issue is one arguably addressed by the bargaining agreement, arbitration is required. *Ringgold School District v. Abramski,* 57 Pa. Commonwealth Ct. 33, 426 A.2d 707 (1981). Section 903 of PERA, 43 P.S. §1101.903, provides that "[a]rbitration of disputes or grievances arising out of the interpretation of the provisions of a collective bargaining agreement is *mandatory*." (Emphasis added).

The review of an arbitrator's decision is highly circumscribed and will not be overturned if it draws its essence from the collective bargaining agreement. *See City of Scranton v. International Association of Machinists & Aerospace Workers Lodge 2305, AFL-CIO,* 95 Pa.

Commonwealth Ct. 540, 505 A.2d 1121 (1986). The broad judicial deference given arbitrators' awards applies with equal force to decisions regarding the arbitrability of a grievance. *Wayne Highlands Education Association v. Wayne Highlands School District*, 92 Pa. Commonwealth Ct. 114, 498 A.2d 1375 (1985).

We first consider SEPTA's contention that the medical disqualification standards at issue here are an embodiment of managerial policy removed from the scope of bargaining by Section 702 of PERA. Section 702 provides that:

> Public employers shall not be required to bargain over matters of inherent managerial policy, which shall include but shall not be limited to such areas of discretion or policy as the functions and programs of the public employer, standards of services . . . *and selection and direction of personnel.* (Emphasis added.)

Morover, the parties to a collective bargaining agreement are prohibited by Section 703 of PERA from the "implementation of [any] provision . . . in violation of, or inconsistent with, or in conflict with any statute or statutes enacted by the General Assembly. . . ."

It cannot be gainsaid that SEPTA is entrusted with the safety and security of its passengers. Section 301(a)(7) of the Pennsylvania Urban Mass Transportation Law, Act of January 22, 1968, P.L. 42, 55 P.S. §600.301(a)(7), declares it to be the policy of the Commonwealth to "promote the public safety, convenience and welfare" by the "establishment of metropolitan transportation authorities." We believe the medical standards at issue here promote the declared public policy in favor of promoting transportation safety and clearly reflect the exercise of managerial discretion in the explicitly reserved area of "selection and direction of personnel." 43 P.S. §1101.702.

We are guided in our determination by this Court's decision in *Division 85, Amalgamated Transit Union v. Port Authority of Allegheny County,* 62 Pa. Commonwealth Ct. 528, 437 A.2d 105 (1981). In *Division 85,* a case involving the medical disqualification of a Port Authority bus driver, we noted that the declared public policy of the Second Class County Port Authority Act, Act of April 6, 1956, P.L. (1955) 1414, *as amended,* 55 P.S. §§551-563.5, was to promote transportation safety and that such safety was promoted by the effectuation of medical standards which disqualified insulin-dependent diabetics from the operation of buses. This Court therein concluded that an arbitration award invalidating the disqualification of a bus driver pursuant to such standards and reinstating him to his position would be violative of that public policy.

As SEPTA is similarly entrusted, by virtue of its enabling legislation, with the promotion of public safety and welfare, we hold that the arbitrator's award invalidating Mr. Melvin's medical disqualification would likewise violate that public policy. Moreover, we believe SEPTA was empowered by Section 702 of PERA, as an exercise of managerial prerogative, to promulgate medical standards presumptively and permanently disqualifying persons suffering from ischemic heart disease from operator positions.

The Union concedes that, while SEPTA was not statutorily *required* to negotiate matters of inherent managerial right such as the medical standards at issue here, it *chose* to do so, as evidenced by Sections 202(b), 304 and 305 of the collective bargaining agreement, and is thus bound by those provisions to arbitrate the instant matter. *See Appeal of City of Pittsburgh,* 67 Pa. Commonwealth Ct. 281, 446 A.2d 1365 (1982); *Scranton School Board v. Scranton Federation of Teachers, Local 1147,* 27 Pa. Commonwealth Ct. 152, 365 A.2d 1339 (1976).

The contract's grievance procedure, found in Section 202(b), provides for arbitration "[i]n the event of a disagreement between the Union and [SEPTA] as to the interpretation, application or performance of this agreement." The trial court found that Section 202(b), when read in conjunction with Section 304 and 305, entitled "Transfers" and "Qualification for Transfer," respectively, required SEPTA to abide by the contractual grievance and arbitration mechanism.

After a thorough review of the pertinent provisions,[4] we fail to perceive how these contractual terms impli-

---

[4] Our thorough review of the collective bargaining agreement does not disclose provisions from which we might infer an agreement by the parties to subject the instant matter to arbitration. SEPTA directs our attention to certain provisions referring to the medical disqualification of employees in support of its contention that the contract does not encompass this matter, an assessment with which we concur. These provisions state as follows:

Section 307. TRANSFER OF DISQUALIFIED BUS-PERSONS WITH SENIORITY.

A busperson with at least fifteen years of Authority service who becomes physically disqualified from operating a bus, but is physically qualified to operate a trolley . . . will be transferred to a surface rail location. . . .

Section 308. TRANSFER TO CASHIER JOB.

Before employes may transfer to vacant or new positions as cashiers under the provisions of Section 304 above, permanently disqualified employes will be transferred to such vacancies in the following order:

(1) Employes who are permanently disqualified as a result of a job-related injury in the order of [SEPTA] seniority.

(2) other permanently disqualified employes who have ten (10) or more years of [SEPTA] service in order of [SEPTA] seniority.

(3) Permanently disqualified employes with less than ten (10) years of service. . . .

Section 503. SUPPLEMENTAL COMPENSATION.

(b) 'Total Disability.' An employe, who sustains an injury in the course of one's employment which, in the opin-

cate the medical standards at issue here so as to render same the object of good faith bargaining. Section 304 of the agreement provides that "[v]acant or new jobs not filled by promotion will be filled by transfer of employees from other jobs . . . who meet all qualifications for the job and are fully qualified to perform all of the work of the job to which the transfer is to be made." Section 305 specifies that the "[q]ualification of an employe for transfer will be determined by [SEPTA]" but permits the Union to "take the matter up under the grievance procedure" if it "believes [SEPTA's] determination as to such qualification has been erroneously made in any case." Nowhere in this language do we see the suggestion that the substance, interpretation or application of the medical standards is subject to the grievance/arbitration mechanism. On the contrary, we agree with SEPTA's assessment that the above provisions concern a transfer applicant's qualifications in terms of objective job skills and experience, rather than the medical qualifications for the class of employment to which transfer is desired. To find otherwise would lead to the anomalous result, as SEPTA posits, that an employee may not challenge a medical disqualification directly but may collaterally attack the determination by applying for a job transfer and then filing a grievance upon SEPTA's refusal.

---

ion of the [SEPTA's] Medical Director renders one unable to perform any work, shall be deemed to be totally disabled.

SECTION 704. DISABILITY PENSION.

[A]ny employe who is permanently incapacitated and has had at least fifteen (15) years of service will be retired on a pension rate. . . .

SECTION 708. SEVERANCE PAY.

An employe who is permanently incapacitated will be given severance pay at the rate of $100 for each full year of service.

The contract is silent as to the substance and application of the medical standards at issue here. We are thus constrained to find that the Board's decision to assume jurisdiction was not rationally "derived from the agreement, viewed in light of its language and context and any other indicia of the parties' intent." *Minersville Area School District v. Minersville Area School Service Personnel Association,* 102 Pa. Commonwealth Ct. 409, 411, 518 A.2d 874, 875 (1986), *citing International Brotherhood of Firemen & Oilers, Local 1201, AFL-CIO v. Board of Education of the School District of Philadelphia,* 500 Pa. 474, 457 A.2d 1269 (1983).

It follows that the Board's decision interpreting the medical standards as they applied to Mr. Melvin violated the "essence test." The interpretation of managerial policy, here removed from the scope of mandatory bargaining by Section 702 of PERA, and not subsequently integrated into the collective bargaining agreement by negotiation of the parties, cannot be rationally derived from that agreement. *See Division 85.*

Accordingly, the order of the Court of Common Pleas of Philadelphia County is reversed.

ORDER

AND NOW, April 24, 1987, the order of the Court of Common Pleas of Philadelphia County in the above-captioned matter is reversed.

---

CONCURRING OPINION BY JUDGE CRAIG:

Because the Southeastern Pennsylvania Transportation Authority (SEPTA) implemented its trolley operator medical qualifications standards by effecting a transfer of former operator Earl Melvin to a non-operator position pursuant to the collective bargaining agreement's sections 307 and 308, which govern the transfer of physically disqualified operators to cashier positions, the

issue here was definitely a transfer in the agreement's own terms and therefore subject to grievance arbitration under section 305 of the agreement, which specifies that the "[q]ualification of an employee for transfer will be determined by [SEPTA]" but permits the union to "take the matter up under the grievance procedure" if it "believes [SEPTA's] determination as to such qualification has been erroneously made. . . ."

Accordingly, the arbitration board here was correct in treating this issue as an arbitrable transfer while, at the same time, recognizing that the board had no authority to make any determination as to the correctness or propriety of SEPTA's medical policy itself. That approach is the only way to read and apply the collective bargaining agreement without negating the effect of section 305, relating to arbitration of SEPTA's determination as to the application of qualification rules affecting transfers. Managerial prerogative permits the employer to decree that one qualification for an operator shall be freedom from ischemic heart disease, but the arbitration mechanism of the agreement is available to forestall fraudulent or erroneous application of that qualification as when, for instance, SEPTA might attempt to transfer an operator for a mere heart murmur or other physical condition not constituting ischemic heart disease.

However, even though the transfer was subject to arbitration, this record, in which there is no dispute that the operator had a history of ischemic heart disease, requires this court to reverse under the authority of *Division 85, Amalgamated Transit Union v. Port Authority of Allegheny County*, 62 Pa. Commonwealth Ct. 528, 437 A.2d 105 (1981), holding that an arbitration board exceeded its authority when it created an exception to a transit authority's medical standard in order to mandate the reinstatement of an operator. In *Division 85*, the arbitrability of the grievance was negated by

collective bargaining terms different from those present here. Nevertheless, our decision in that case requires a conclusion that, even though the issue here was arbitrable, the arbitration board exceeded its authority when it did not just examine the application of the medical standard, but instead overrode the medical standard.

President Judge CRUMLISH, JR. and Judge BARRY join this concurring opinion.